O

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY ALVAREZ, ) | CASE NO. CV 04-6383 AG (MLGx) |
| Plaintiff, ) | |
| ) | FINDINGS OF FACT AND |
| v. ) | CONCLUSIONS OF LAW |
| J. INIGUEZ, ET AL., ) | |
| Defendants ) | |
| _____) | |

     Plaintiff Anthony Alvarez ("Alvarez") claims excessive force was used when his penis piercing was ripped out during a strip search by members ("Defendants") of the San Bernardino Sheriff's Department ("Department"). As a prisoner in jail, Alvarez has limited or no access to cameras, doctors, witnesses, or other methods to corroborate his story. The Defendants and the Department and the county they serve had numerous opportunities and obligations to corroborate their story, but they did not. In part because of these failures, including failures San Bernardino County ("County") could have easily rectified, the burden of proof tips in favor of Alvarez, who is awarded $3,000 in compensatory damages and $2,000 in punitive damages against the Defendants jointly and severally.

## FINDINGS OF FACT

After reviewing the evidence and evaluating the credibility of the witnesses and other evidence, the Court makes the following findings of fact, including any findings of fact found in the Conclusions of Law. A proper transcript has not been prepared, so there are no transcript references.

1. The Court finds that Defendants had numerous opportunities to corroborate their story, but did not do so. Court orders must be followed, and if the Court order that Alvarez be seen forthwith by a doctor had been followed, this trial likely would not have been necessary. In contrast, Alvarez had limited opportunity to corroborate his story. But his story is made more believable because he consistently sought medical attention that would have branded him either as a victim or a liar. The Court finds that on numerous occasions, the Defendants did not follow orders and procedures that would have proved or disproved Alvarez's claim.

2. The Court finds that on key issues, Alvarez's story was more believable than the alternative factual scenarios presented.

3. The Court finds that the Defendants have a difficult job dealing with difficult prisoners, but the difficulty of their job does not excuse failures like not providing medical care as ordered by a court.

4. Alvarez was a pre-trial detainee at West Valley Detention Center (the "Facility" or "West Valley") awaiting trial for charges of violations of Penal Code §§496D(a), 496(A) (four counts): buying or receiving stolen property and receiving known stolen property. (Defendants' Findings of Fact and Conclusions of Law ("Defendants' Findings") 1.) (Since the Court has ruled against Defendants, it cites where possible the Defendants' Findings on the facts.)

5. Alvarez entered the West Valley Detention Center on August 2, 2003. (Defendants' Findings 2.)

1       6.      Alvarez had a Readiness Hearing in his criminal action at the courthouse on April 8, 2004 and was to be transported to the courthouse by the San Bernardino County Sheriff's Department. (Defendants' Findings 3.)

        7.      On the morning of April 8, 2004, Alvarez was awoken early and fed breakfast. He was shackled and handcuffed, and escorted to the transportation unit with other inmates to be transported to court. This process is called a court pull. (Defendants' Findings 4.)

        8.      Alvarez was taken from the High Security Unit, Unit 5 with other inmates to a holding line outside of the transportation unit to be processed. (Defendants' Findings 5.)

        9.      The Captain of the Facility gave orders on different mornings for clothing exchanges to take place from inmates in all or some of the units. (Defendants' Findings 6.)

        10.     On the morning of April 8, 2004, Defendant Robert Balderama ("Balderama") was given the order from administration to issue new clothing to all inmates in the high security units of Unit 5 and Unit 6 who were being transported to court. (Defendants' Findings 7.)

        11.     Balderama was employed by the County of San Bernardino Sheriff's Department as a Sergeant. Balderama was assigned to and on duty at West Valley on the morning of April 8, 2004. That morning, he oversaw the "court pull" process, which involved preparing inmates to be transported from the Facility to court. Balderama was present for and observed the strip searches that occurred that morning in the room adjacent to West Valley's Transportation unit. Balderama also responded to Alvarez's Inmate Grievance Form regarding the events of April 8, 2004. Defendants Angel Garcia ("Garcia"), Jeffrey Hewitt ("Hewitt"), and Jose Iniguez ("Iniguez") were employed by the County of San Bernardino Sheriff's Department as Deputy Sheriffs. Garcia, Hewitt, and Iniguez were assigned to West Valley and on duty on the morning of April 8, 2004. Each of them participated in

1  the court pull and observed or participated in the strip searches that occurred just
2  outside the Transportation Unit that morning. Iniguez also prepared an Inmate
3  Discipline Report regarding the events of April 8, 2004.

4      12.   Orders were given to prevent violence between high security inmates,
5  which had been escalating during this time period, and to search the clothing for
6  any weapons or contraband. (Defendants' Findings 8.)

7      13.   Alvarez was removed from the line by Garcia, isolated away from the
8  other inmates, and placed against a wall by Garcia. He was held to the wall for
9  about a minute by Garcia who stood behind him and placed his elbow to Alvarez's
10 back and placed his feet behind Alvarez's legs, until it was time for Alvarez to
11 move into clothing exchange. (Defendants' Findings 10.)

12     14.   Alvarez was escorted to a room where the clothing exchange was
13 conducted by Hewitt. Hewitt exchanged Alvarez's clothing with new clothing,
14 searching the clothing and the inmate for contraband. (Defendants' Findings 11.)

15     15.   During the search, Hewitt noticed something on Alvarez's penis and
16 asked Alvarez what the item was. (Defendants' Findings 12.)

17     16.   Two deputies took Alvarez's arms and placed them on the wall to
18 restrain Alvarez. (Defendants' Findings 13.)

19     17.   Hewitt gave Alvarez several commands to remove the item on his
20 penis. (Defendants' Findings 14.)

21     18.   Iniguez authored the discipline report recommending jail discipline
22 time for the violation of miscellaneous rule violations. (Defendants' Findings 17.)

23     19.   Sergeant Espinoza interviewed Alvarez regarding the discipline report
24 and authorized the discipline. (Defendants' Findings 18.)

25     20.   Alvarez wrote a grievance concerning the incident, stating he was
26 stripped and fondled by Hewitt; that his arms were twisted; that his head was
27 slammed into the wall; that Iniguez and Garcia were present; that Hewitt ripped a
28 piercing from his penis causing him bleeding and pain; and that his legal

1  documents were taken and thrown away. (Defendants' Findings 19.) The Court
2  finds that Alvarez did not routinely complain or write grievances.
3      21.    Alvarez's grievance was given to Balderama to investigate.
4  (Defendants' Findings 20.) It was not ideal that the investigation be done by
5  someone involved in the event investigated, and Balderama testified that they try to
6  avoid this.
7      22.    On the morning of April 8, 2004, Alvarez was scheduled to attend a
8  hearing in the criminal case for which he was being detained.
9      23.    As part of the process for preparing Alvarez to be transported to court,
10 West Valley personnel woke him early and notified him (via intercom in his cell)
11 that he would be traveling to court.
12     24.    Alvarez was provided breakfast through a "tray slot" in his cell door.
13     25.    After breakfast, Alvarez dressed and gathered the documents he
14 intended to take with him to court.
15     26.    After Alvarez had eaten and dressed, San Bernardino County Sheriff's
16 Deputy Daniel Rice ("Rice") approached Alvarez's cell. Rice had an unobstructed
17 view of Alvarez through a window in the cell's door.
18     27.    Rice asked Alvarez to hand the documents he planned to take with
19 him to court that day to him through the tray slot in the cell door. Alvarez
20 complied.
21     28.    Rice then informed Alvarez that he would be conducting a strip search
22 and ordered him to remove his clothing and hand it out through the tray slot.
23     29.    Alvarez again complied, and passed all of his clothing through the
24 door, one piece at a time to Rice, who inspected each article of clothing. After
25 removing his clothes, Alvarez was standing naked before Rice.
26     30.    Rice then conducted a "body search" of Alvarez. While Rice stood at
27 the cell window and used a flashlight to observe Alvarez, he instructed Alvarez to
28 take the following actions to present various parts of his body for inspection: lift

1  his arms out in front of him and show the palms of his hands and the spaces
2  between his fingers; lift his arms over his head and wiggle his fingers; run his
3  hands over his shave head; turn his head to the side and show his ears and under
4  his earlobes; tilt his head back and show the insides of his nostrils; open his mouth,
5  run his fingers along his gum lines, then stick out his tongue and show the inside of
6  his mouth; show his penis area, then the underside of his testicles; turn around, lift
7  each leg, and show the bottoms of his feet and between his toes; grab each side of
8  his buttocks and bend over at the waist while Rice directed a flashlight at his anal
9  cavity; then squat three times, coughing each time he reached he bottom of the
10 squatted position.

11       31.    Rice did not claim to find any contraband during the search. If Alvarez had been concealing a bag of lotion in or around his anal cavity at the time of this first strip search – as Defendants later contended – Rice would have observed it during the course of this thorough search.

15       32.    As soon as Rice completed the body search, he returned Alvarez's clothing to him and ordered Alvarez to redress. Alvarez complied with that order.

17       33.    Immediately after Alvarez dressed, Rice ordered him to put his hands behind him and to back up to the cell door to be handcuffed through the slot in the cell door. Alvarez complied with the order.

20       34.    Immediately after Alvarez was handcuffed, his cell door was unlocked and opened. Rice then took hold of Alvarez's arm, escorted him out of the cell, and placed Alvarez in leg shackles.

23       35.    Rice then handed Alvarez's legal papers back to him.

24       36.    As soon as the leg shackles were put in place and Alvarez had his legal papers back in his hands, Rice walked him to the front of Alvarez's section, or "pod," of Unit Five. At no time after the first strip search was conducted and before the time of the second strip search minutes later was Alvarez left alone. He had no opportunity to conceal a bag of lotion in or around his anal cavity.

37. Rice then escorted Alvarez out of Unit Five and down a series of corridors where he placed Alvarez in a line with a number of other inmates known as the court line.

38. The court line led to a set of double doors that, in turn, led to a room known as the "sally port." Just beyond the sally port was the Facility's Transportation Unit, the area where inmates were held before being transported to court.

39. A number of officers already were in the sally port when Garcia pulled Alvarez into the sally port.

40. After a few minutes, Garcia released his hold, removed Alvarez's handcuffs and leg shackles, then pinned Alvarez to the wall, as previously stated.

41. The officers in the sally port proceeded to subject Alvarez to a second stip search, just minutes after Alvarez had been strip searched in his cell.

42. Hewitt explained to Alvarez that he would conduct a strip search, then proceeded to give Alvarez a series of verbal instructions to remove his clothing piece-by-piece – first his outer shirt, followed by his undershirt, shoes, socks, pants, and finally, his underwear.

43. Alvarez complied with Hewitt's directions, removing his clothing piece-by-piece.

44. Once Alvarez was fully undressed, Hewitt went through the same "body search" process to which Alvarez had been subjected in his cell immediately before being handcuffed and led to the sally port. Hewitt ordered Alvarez to turn around, such that he was facing the room full of officers. Hewitt then went through the process of checking Alvarez's palms, underarms, head, ears, nose, mouth, genitals, feet, and finally, his anal cavity, by ordering Alvarez to face the wall, grab his buttocks, and bend over, and then by ordering him to squat and cough three times. Alvarez complied with all of Hewitt's orders.

45. Hewitt stood directly in front of Alvarez. Balderama, Garcia, and

Iniguez were standing nearby.

46. Hewitt then dropped to his knees and took Alvarez's penis in his hand.

47. Alvarez's penis was pierced. The incision for the piercing was located on the underside of the shaft of Alvarez's penis, just below the head. It consisted of a subcutaneous tunnel with two exit points (holes in the skin). Alvarez used materials he obtained in the Facility to create a makeshift piece of jewelry, comprised of a plastic hoop with a metal hook. The hoop did not fully close. Alvarez was wearing the hoop through the incision in his penis on the morning of April 8, 2004.

48. The fact that Alvarez had his penis pierced was known to officers at the Facility. Including the strip search earlier on April 8, 2004, Alvarez had been through numerous other strip searches at the Facility while wearing the particular piercing he was wearing on April 8, 2004, and at no time had any officer asked or told him to remove it.

49. Alvarez, apprehensive of the fact that Hewitt was looking at the piercing in his penis, shouted out that it was a piercing.

50. Hearing that the object was a piercing, Hewitt told Alvarez he didn't care. And Iniguez, who was standing behind Hewitt, called for Hewitt to "rip that motherfucker out."

51. Hewitt then tore the piercing from Alvarez's penis by pulling it through the existing entry and exit points. This caused the points at which the piercing entered and exited the skin to tear and bleed and caused Alvarez to cry out in pain.

52. Hewitt then directed Alvarez to redress. Alvarez complied.

53. Hewitt led Alvarez through the doors to the Transportation Unit. Once inside, he walked Alvarez through a freestanding metal detector. The transportation officer remarked that Alvarez was "having a bad day," then removed

the original handcuffs and fitted Alvarez with a new set of handcuffs and shackles that were used for inmate transport.

54. Alvarez then was transported to the San Bernardino County Superior Court located in Rancho Cucamonga.

55. Judge Gerard S. Brown ("Judge Brown") presided over Alvarez's hearing that morning.

56. Alvarez told Deputy Public Defender Carolle LeMonnier ("LeMonnier") – the attorney defending him in his criminal matter – about the events that had transpired and the injuries he sustained at the hands of Defendants. In turn, LeMonnier informed Judge Brown, who ordered, on the record, that Alvarez "be seen forthwith by doctors at West Valley Detention Center." (Reporter's Transcript of Oral Proceedings for April 8, 2004 (Exhibit 8), 2:20-21.)

57. Judge Brown also entered a written Minute Order that same day reiterating that Alvarez was "to receive a medical examination at West Valley Detention Center." Exhibit 1.

58. Upon his return to West Valley, Alvarez immediately complained to others about the way he had been abused.

59. That same day, April 8, 2004, Alvarez wrote out an Inmate Grievance Form detailing the second strip search that morning and the officers' misconduct. In that form, he described his injuries at the hands of the Defendants and requested medical treatment. Alvarez submitted the Inmate Grievance Form the very next day, April 9, 2004. Exhibit 3. The Court finds it significant that in Exhibit 3, Alvarez specifically stated in writing that the piercing had been ripped out and that the judge had ordered medical attention. Alvarez was placing his credibility on the line, and in writing. If the court order Alvarez had identified to all reviewing his claim had simply been followed, the claim would have been proven or disproven. Thus, Alvarez's request for medical attention supports his claim, and the failure to "forthwith" honor the court order for medial attention calls into question

Defendants' story.

60. Balderama was assigned the duty of responding to Alvarez's grievance.

61. On April 9, 2004, Sergeant Carlos Espinoza ("Espinoza") met with Alvarez in his cell to review the Discipline Report. At that time, Alvarez attempted to show Espinoza the injuries to his penis. He told Espinoza he could prove that his story was true and pulled his penis out for Espinoza to see the injury. But Espinoza refused to look at Alvarez's injury.

62. In the days that followed the incident, Alvarez told numerous West Valley personnel about his injuries, and repeatedly asked for medical treatment. West Valley personnel refused to provide any medical treatment to Alvarez – or even a medical examination, as the court had ordered – for several weeks. In the meantime, Alvarez treated the injury to his penis by himself, using antibiotic ointment obtained from other inmates in his pod. By the time Alvarez finally was visited by West Valley's medical personnel, the torn skin on his penis had healed.

63. The authorities at West Valley deliberately delayed providing Alvarez with medical care – including the care the court on April 8 had ordered to be given to Alvarez "forthwith" – to give time for Alvarez's injuries to heal. They knew that if they waited long enough before providing Alvarez the court-ordered medical care, the external evidence of his injuries would have dissipated or disappeared. Had Defendants or other authorities at West Valley complied with the court's order to provide medical care "forthwith" to Mr. Alvarez, medical personnel readily would have seen the ripped skin on Alvarez's penis.

64. There is no justification or excuse for the excessive force Defendants used against Alvarez in ripping out his penis piercing on April 8, 2004. Nor is there any justification or excuse for the failure to provide a corroborating medical examination forthwith, as ordered by Judge Brown.

65. Alvarez has made other claims of excessive force on April 8, 2004

besides the ripping out of the penis piercing. These other claims are harder to prove, and Alvarez has not met his burden to prove them. Force is sometimes necessary in handling prisoners, and it is difficult to prove when such force becomes excessive. It has not been proven that Alvarez provided no improper resistance on April 8, 2004. The Court cannot find that immediate medical attention would have proven any improper conduct besides the ripping out of the penis piercing. But it can and does find that the ripping out of the penis piercing supports a judgment for Alvarez.

CONCLUSIONS OF LAW

The Court makes these conclusions of law, including any conclusions of law found in the Findings of Fact.

66. Alvarez has the burden of proving his case by a preponderance of evidence.

67. This Court has jurisdiction under 28 U.S.C. § 1343(3) and is the appropriate venue under 28 U.S.C. § 1391(b).

68. Alvarez has established that Defendants are liable under 42 U.S.C. § 1983. He has proven by a preponderance of the evidence that (1) Defendants acted under color of law and (2) Defendants' acts deprived him of his rights under the Constitution of the United States. *See* 42 U.S.C. § 1983; *see also Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir. 1978). Specifically, Alvarez has demonstrated that Defendants violated his rights under the Fourth and Fourteenth Amendments.

69. The Defendants acted under color of law. At all relevant times, they were employed by the County. They acted in their capacity as peace officers and employees of the County when they participated in the second strip search of Alvarez on the morning of April 8, 2004.

70. The second strip search of Alvarez on the morning of April 8, 2004

constituted an unreasonable search and seizure under the Fourth Amendment. *See Fontana v. Haskin,* 262 F.3d 871, 879 (9th Cir. 2001) ("the Fourth Amendment prohibition against unreasonable search and seizure continues to apply after an arrestee is in the custody of the arresting officers") (citing *Albright v. Oliver,* 510 U.S. 266, 277 (1996) (Ginsburg, J., concurring) (seizure continues through criminal trial)). All Defendants participated in the second strip search of Alvarez, and, though they all had ample time and a realistic opportunity to do so, did not intercede to stop the ripping out of the penis piercing.

71. The use of excessive force in the second strip search of Alvarez on the morning of April 8, 2004 violated Alvarez's rights under the Fourth and Fourteenth Amendments. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

72. The second strip search of Alvarez on the morning of April 8, 2004 deprived Alvarez of his constitutional rights. An inmate's rights to be free from unnecessary search and seizure and from the use of excessive force by police officers are clearly established rights protected by the Fourth and Fourteenth Amendments. *See Fontana*, 262 F.3d at 878-79; *Bell*, 441 U.S. at 535. Further, the contours of those rights were sufficiently clear that a reasonable officer under similar circumstances would have recognized that the force used on Alvarez during the second strip search on April 8 violated those rights. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1060-61 (9th Cir. 2006) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)); *see also Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001) ("'A public official is not entitled to qualified immunity when the contours of the allegedly violated right were sufficiently clear that a reasonable official would understand that what he [was] doing violated that right.'") (quoting *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996)). *See Medora v. City & County of San Francisco*, 2007 U.S. Dist. LEXIS 67471, at *8 (N.D. Cal. Aug. 31, 2007) ("Police officers have a duty to intervene when fellow officers violate [the] constitutional rights of a citizen" and can be held liable under Section 1983 "if they had a realistic

opportunity to intercede.") (citing *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000)).  All Defendants were integral participants in the deprivation of Alvarez's Fourth Amendment rights.

73.    Defendants' actions caused the deprivation.

74.    Alvarez was injured during the second strip search on the morning of April 8, 2004 by the forceable removal of the penis piercing.  In determining the extent of the injury, the Court has considered that the piercing was ripped out through existing holes, rather than by being ripped out through the skin between the holes.  The damages are necessarily limited for this Defendant since he has voluntarily subjected himself to the pain of piercing his penis, and therefore is limited in complaining of unbearable pain.  Alvarez is entitled to recover $3,000, jointly and severally against each of the Defendants, in compensatory damages for the pain, suffering, and humiliation he suffered at their hands.

75.    Alvarez is entitled to punitive damages.  As described above, Defendants acted with malice or, at the very least, with reckless indifference to Alvarez's constitutionally protected rights.  *See Schall v. Vazquez*, 322 F. Supp. 2d 594, 602 (E.D. Penn. 2004) ("A plaintiff party may recover punitive damages in a Section 1983 case if the defendant's actions were committed with 'malice or reckless indifference to the federally protected rights of an aggrieved individual.'") (quoting *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526 (1999)).  Alvarez is entitled to recover $2,000, jointly and severally against each of the Defendants, in punitive damages for Defendants' malicious or reckless conduct.  In determining the amount of punitive damages, the Court has considered such damages in relation to the compensatory damages.

76.    Alvarez is entitled to his reasonable attorneys' fees under 42 U.S.C. Sections 1988(b) and 1997e(d).  "In any action or proceeding to enforce a provision of [Section 1983 of this title] the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of

the costs. . . ." 42 U.S.C. § 1988(b); *see also Maine v. Thiboutot*, 448 U.S. 1, 9 (1980) ("The statute states that fees are available in any § 1983 action.") (emphasis removed). Because Alvarez prevailed on his Section 1983 claim against Defendants, he is entitled to his reasonable attorneys' fees, the amount of which shall be determined by post-trial submissions and briefing.

77. The Court concludes here with its finding that the County could have avoided this lawsuit if it had promptly complied with Judge Brown's order.

DISPOSITION

Alvarez's counsel is directed to prepare the judgment and serve it on Defendants by September 15, 2008. Defendants shall have 14 days from the date of service of the proposed judgment to object to the proposed judgment. If no objection is received within 14 days, the judgment will be entered immediately, and Federal Rule of Civil Procedure 52(b) will apply on entry of the judgment.

IT IS SO ORDERED.

DATED: September 5, 2008

_____
Andrew J. Guilford
United States District Judge